211.

The benefits that LCMC Health derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for LCMC Health to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

212.

LCMC Health should therefore be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that LCMC Health received, and should be enjoined from engaging in further unlawful and inequitable conduct, as described herein.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff, Pebbles Martin, respectfully prays that this Second Amended Petition be deemed good and sufficient; that, after due proceedings be had, this action be certified as a class action pursuant to Articles 591(B)(2) and /or (B)(3) of the Louisiana Code of Civil Procedure; and that, after further proceedings be had, there be judgment in favor of Plaintiff and the proposed class and against LCMC Health for all damages and other remedies together with the costs of these proceedings, legal interest, attorney's fees, and any and all general or equitable relief, including injunctive relief, which may be reasonable under the circumstances.

This 27th day of January, 2023.

Respectfully submitted,

/s/ Stephen J. Herman
**Stephen J. Herman**, La. Bar No. 23129
**Joseph E. "Jed" Cain**, La. Bar No. 29785
**HERMAN, HERMAN, & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Facsimile: (504) 561-6024
E-Mail: sherman@hhklawfirm.com
E-Mail: jcain@hhklawfirm.com

**Foster C. Johnson** (*pro hac vice forthcoming*)
**David Warden** (*pro hac vice forthcoming*)
**Weining Bai** (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS, & MENSING, P.C.**
1221 McKinney Street, Suite 3460
Houston, Texas 77010
Telephone: (713) 655-1101
E-Mail: fjohnson@azalaw.com
E-Mail: dwarden@azalaw.com
E-Mail: ncampbell@azalaw.com

***Counsel for Plaintiff, Pebbles Martin,***
***Individually and on Behalf of***
***All Others Similarly Situated***

FILED

2023 JAN 27  P 12:20

CIVIL

DISTRICT COURT

## Certificate of Service

I HEREBY CERTIFY that the above and foregoing pleading will be filed into the record *via*

the Court's electronic filing system and will also be served *via* e-mail upon Defendants thru

counsel, this 27<u>th</u> day of <u>January</u>, <u>2023</u>:

> E. Paige Sensenbrenner, Esq.
> Roland M. Vandenweghe, Jr., Esq.
> ADAMS & REESE
> 701 Poydras Street, Suite 4500
> New Orleans, Louisiana 70139
> Telephone: (504) 581-3234
> E-Mail: Paige.Sensenbrenner@arlaw.com
> E-Mail: Roland.Vandenweghe@arlaw.com

_____ /s/ Stephen J. Herman_____

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

**NO. 2022-10417**          **DIVISION: "L"**          **DOCKET NO.**

**PEBBLES MARTIN,**
**individually and on behalf of others similarly situated,**

**v.**

**LCMC HEALTH HOLDINGS, INC.**

FILED                                                    DEPUTY CLERK

## PLAINTIFF'S PRELIMINARY MOTION FOR CLASS CERTIFICATION

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, Pebbles Martin, who respectfully submits the following Preliminary Motion for Class Certification:

I.

Plaintiff respectfully submits this Preliminary Motion and accompanying Memorandum for the benefit of the Parties and the Court, out of an abundance of caution and in accordance with Louisiana Code of Civil Procedure Article 592(1). It is contemplated that a more formal and comprehensive Motion for Class Certification with supporting evidence and other documentation will be filed following the completion of class discovery, which may include a slightly modified proposed Class Definition or other argument(s) and/or suggestion(s) in light of information that may be uncovered through discovery and/or based on any intervening orders, rulings or directives of the Court.

II.

As set forth in Plaintiff's Petition and Amended and Restated Petition, the plaintiff seeks to certify a class action under Louisiana Code of Civil Procedure Articles 591(B)(2) and/or 592(B)(3), preliminarily defined as:

> All citizens of the state of Louisiana who, from June 15, 2012 thru [the Date of Certification] are, or were, patients of LCMC Health or any of its affiliates, and who exchanged communications on one or more of Defendant's websites.

Excluded from the Proposed Class are (1) any Judge or Magistrate or Special Master presiding over this action and members of their families and staffs; (2) the Defendant, Defendant's

FILED

2023 JAN 03  P 03:26

CIVIL
DISTRICT COURT

subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest, as well as their current or former officers, directors, and/or employees; and (3) Plaintiff's counsel and Defendant's counsel.

III.

The Proposed Class is so numerous that joinder of all individual claims at issue is impracticable.

IV.

There are common issues of law and fact as to:

a. Whether Defendant's acts and practices violated Plaintiffs and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate La. R.S. 15:1303;

c. Whether Defendant's acts and practices violate La. R.S. 51:3074;

d. Whether Defendant's acts and practices violate 48 La. Admin. Code Pt 1, §9319;

e. Whether Defendant's acts and practices violate La. Admin. Code Pt. 1, §505;

f. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs and Class Members' Personal Health Information to Facebook (and/or other third parties);

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and/or disgorgement; and

i. Whether Plaintiffs and Class Members are entitled to statutory damages.

V.

Plaintiff's claims and defenses are typical of the claims of all Proposed Class Members.

VI.

Plaintiff and Undersigned Counsel will fairly and adequately represent and protect the interests of the Class.

VII.

The Proposed Class is defined objectively in terms of ascertainable criteria. Indeed, it is believed and alleged that Defendant (and/or one or more third parties, such as and including Facebook) maintain records from which each Proposed Class Member can be identified and ascertained.

E-Filed

FILED

2023 JAN 03  P 03:26
CIVIL
DISTRICT COURT

VIII.

Defendant has acted on grounds generally applicable to the Proposed Class, thereby

making appropriate final injunctive relief, and/or associated declaratory and/or equitable relief,

appropriate with respect to the Proposed Class as a whole;

IX.

The common issues of fact and law predominate over any individual issues (if any).

X.

A class action provides a fair and efficient method for adjudicating this controversy and is

superior to the other available methods of adjudication in that:

i. Neither the size of the Proposed Class, nor any other factor, make it likely that difficulties will be encountered in the management of this Proposed Class as a class action;

ii. The prosecution of separate actions by individual Class Members, or the individual joinders of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudication, while a single class action can determine, with judicial economy, the rights of each member of the Proposed Class;

iii. Because of the disparity of resources available to Defendant versus those available to individual Class Members, prosecution of separate actions would work a financial hardship on many Class Members;

iv. The conduct of this action as a class action conserves the resources of the parties and the court system and protects the rights of each Class Member, while meeting the due process requirements and to fairness to all parties. A class action is also superior to the maintenance of these claims on a claim-by-claim basis when all actions arise out of the same circumstances and course of conduct; and

v. Because the claims may be small or nominal in nature, individual actions will be rendered financially impractical if not impossible.

XI.

The basis for Plaintiff's Motion is further set forth in the accompanying Memorandum filed

contemporaneously herewith.

This 3rd day of January, 2023.

Respectfully submitted,

*/s/ Stephen J. Herman*
**Stephen J. Herman**, La. Bar No. 23129
**Joseph E. "Jed" Cain**, La. Bar No. 29785
**HERMAN, HERMAN, & KATZ, LLC**

Page **3** of **4**

FILED

2023 JAN 03  P 03:26

CIVIL

DISTRICT COURT

820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Facsimile: (504) 561-6024
E-Mail: sherman@hhklawfirm.com
E-Mail: jcain@hhklawfirm.com

**Foster C. Johnson** (*pro hac vice forthcoming*)
**David Warden** (*pro hac vice forthcoming*)
**Weining Bai** (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
Telephone: (713) 655-1101
E-Mail: fjohnson@azalaw.com
E-Mail: dwarden@azalaw.com
E-Mail: ncampbell@azalaw.com

*Counsel for Plaintiff Jane Doe,*
*Individually and on Behalf of*
*All Others Similarly Situated*

## Certificate of Service

I HEREBY CERTIFY that on the 3rd day of January, 2023, the above and foregoing Motion

will be electronically filed into the Court Record, and a copy of the Motion and Memorandum will

also be served upon Defendant, thought its Agent for Service of Process, *via* U.S. Mail, properly

addressed and postage pre-paid:

LCMC Health Holdings, Inc.
*Through its Designated Agent for Service of Process:*

ROBERT HINYUB
4200 Houma Blvd.
Metairie, LA 70006

/s/ Stephen J. Herman

FILED

2023 JAN 03 P 03:26

CIVIL

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**          DISTRICT COURT

**STATE OF LOUISIANA**

**NO. 2022-10417**                **DIVISION: "L"**                **DOCKET NO.**

**PEBBLES MARTIN,**
**individually and on behalf of others similarly situated,**

**v.**

**LCMC HEALTH HOLDINGS, INC.**

_____                _____

FILED                                DEPUTY CLERK

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S PRELIMINARY MOTION FOR CLASS CERTIFICATION**

Plaintiff respectfully submits the following Memorandum in Support of Plaintiff's Preliminary

Motion for Class Certification:

**MAY IT PLEASE THE COURT:**

This case is inherently suitable for class treatment, as the defendant breached identical

statutory duties owed to each and every Class Member, in an objective and ascertainable way.

This is not a "sprawling" mass tort class action, where multiple defendants, choice of law issues,

or individual issues of assumption of risk, comparative fault, causation, reliance, or damages,

might render certification inappropriate or incomplete.  The recovery of restitution and/or the

statutory penalties claimed herein will not require the introduction of new and substantial legal or

factual issues, nor entail complex individualized determinations, nor require additional hearings to

resolve the disparate merits of each individual Class Member's case; rather, they are capable of

computation by means of objective standards, and are not dependent in any significant way on the

intangible, subjective differences of each Class Member's circumstances.[1]  While the Louisiana

---

[1] *Cf.* Allison v. CITGO, 151 F.3d 402, 415 (5ᵗʰ Cir. 1998). Indeed, as contrasted with the complex claims
sought to be certified in *Allison,* this case is much more similar to the case that the Louisiana Supreme Court approved
for certification in Baker v. PHC-Minden, LP, 2014-2243, pp.18-19 (La. 5/5/15), 167 So.3d 528, 541-542 ("the record
shows there is little proof on liability or causation necessary in this case individual to each plaintiff. Their claims do
not require highly individualized inquiries into the cause of the damages. The alleged damages were caused by
Minden's acting pursuant to its collection policy and procedure. The eventual question for the factfinder is whether or
not Minden's actions violated the Balance Billing Act. Once the factfinder determines Minden's actions pursuant to its
collection policy did or did not violate the Balance Billing Act, liability and causation for all class members is
decided.... There is no indication the consideration of the billing issue, particular to the plaintiffs, would require
individual trials or be unduly burdensome. To the contrary, the evidence shows many claims may be small or nominal
in nature, rendering individual actions financially impractical, if not impossible. Accordingly, we find the evidence
does reasonably show the class action is the superior method for adjudication").

E-Filed

FILED

2023 JAN 03 P 03:26

CIVIL
DISTRICT COURT

Supreme Court has emphasized that "the mere fact that varying degrees of damages may result from the same factual transaction and same legal relationship or that class members must individually prove their right to recover does not preclude class certification,"[2] the statutory penalties available in this case (as well as any collective disgorgement or restitution that may be owed to the class as a whole) will not even raise such potential complications, but can be mathematically determined based on the defendant's own business records.[3]  For these reasons, and for the reasons further outlined below, class certification should be granted.

## **Preliminary Statement**

Plaintiff respectfully submits this Preliminary Motion and accompanying Memorandum for the benefit of the Parties and the Court, out of an abundance of caution and in accordance with Louisiana Code of Civil Procedure Article 592(1).  It is contemplated that a more formal and comprehensive Motion for Class Certification with supporting evidence and other documentation will be filed following the completion of class discovery, which may include a slightly modified proposed Class Definition or other argument(s) and/or suggestion(s) in light of information that may be uncovered through discovery and/or based on any intervening orders, rulings or directives of the Court.

## **The Plaintiff's Claims**

This case arises from Defendant's systematic violation of the medical privacy rights of its customers. Although LCMC states in its Notice of Privacy Practices that it "will not sell or otherwise provide the information we collect to outside third parties for the purposes of … marketing," LCMC discloses the protected health information of its patients and would-be-patients through the deployment of a digital tool called the Meta Pixel software code embedded on LCMC's websites, to purposefully and intentionally capture and re-direct patient communications that contain sensitive personal health information to Facebook, which exploits that information for advertising purposes – in violation of those patients' rights and reasonable expectations of privacy

---

[2] Brooks v. Union Pacific Railroad, 2008-2035 (La. 5/22/09), 13 So.3d 546, 559; Bartlett v. Browning-Ferris Industries Chemical Services, Inc., 99-0494 (La. 11/12/99), 759 So.2d 755, 756.

[3] *See, e.g.,* Oubre v. Louisiana Citizens Fair Plan, 2011-0097 (La. 12/16/11), 79 So.3d 987 (affirming award of statutory penalties to members of certified class based on defendant's own business records); *see also, e.g.,* Andrews v. TransUnion Corp., 2004-2158 (La. App. 4th Cir. 8/17/05), 917 So.2d 463, *writ denied,* 926 So.2d 495 (La. 4/17/06) (certifying class for unjust enrichment, seeking disgorgement of profits that TransUnion unlawfully earned from its sale of information in plaintiffs' private consumer credit files to target marketers in violation of Louisiana consumer protection statutes).

FILED
2023 JAN 03  P 03:26
CIVIL
DISTRICT COURT

as citizens of the State of Louisiana.[4]   Plaintiff, for herself and the Proposed Class, brings suit to

enjoin such practices, to recover restitution and/or disgorgement of ill-gotten gains, and to recover,

under Louisiana Revised Statute 15:1312(A), statutory penalties and attorneys' fees.[5]

## The Pre-Requisites for Certification Are Satisfied under Article 591(A)

In considering the pre-requisites and other requirements for class certification, the Supreme

Court has instructed that any errors should be made in favor of, and not against, the maintenance

of a class action, as the certification order is always subject to modification if later developments

so require. Baker v. PHC-Minden, LP, 2014-2243, p.11 (La. 5/5/15), 167 So.3d 528, 537;

McCastle v. Rollins Environmental Services, 456 So.2d 612, 620 (La. 1984).

### *Class Members are Sufficiently Numerous*

While the exact number of Proposed Class Members is unknown at this time, Plaintiff is

confident that Defendant's website data or other business records will establish that the Proposed

Class is so numerous that joinder of all members is impracticable.

### *There Are Common Questions of Fact and Law*

The Plaintiff in this case contends, for both herself and for the Proposed Class, that:

   a. Defendant's acts and practices violated Plaintiff's and Class Members'
      privacy rights;

   b. Defendant's acts and practices violate La. R.S. 15:1303;

   c. Defendant's acts and practices violate La. R.S. 51:3074;

   d. Defendant's acts and practices violate 48 La. Admin. Code Pt 1, §9319;

   e. Defendant's acts and practices violate La. Admin. Code Pt. 1, §505;

   f. Defendant knowingly allowed the surreptitious collection and disclosure
      of Plaintiff's and Class Members' Personal Health Information to
      Facebook (and/or other third parties);

   g. Defendant profited from disclosures of patient Personal Health
      Information to third parties including Facebook;

---

[4] *See generally,* LA. REV. STAT. 15:1303, *et seq.* (Interception and Disclosure of Wire, Electronic, or Oral Communications), LA. REV. STAT. 51:3074 (Protection of Personal Information; Disclosure upon Breach in the Security of Personal Information; and Notification Requirements), 48 LA. ADMIN. CODE Pt. 1, §9319 (Patient Rights and Privacy), and LA. ADMIN. CODE Pt. 1, §505 (Confidentiality and Disclosure), as well as LA. CIV. CODE ARTS. 2315, 2316 and/or 2324(A).

[5] Louisiana Revised Statute 15:1312(A) provides that: "Any person whose wire, electronic, or oral communication is intercepted, disclosed, or used in violation of this Chapter shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and be entitled to recover from any such person: (1) Actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation or one thousand dollars, whichever is greater; and (2) A reasonable attorney's fee and other litigation costs reasonably incurred."

E-Filed

h. Plaintiff and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and/or disgorgement; and

i. Plaintiff and Class Members are entitled to statutory damages.

Each of these common contentions "is capable of classwide resolution" in that the determination of the truth or falsity of each contention "will resolve an issue central to the validity of each one of the claims" of the Plaintiff and each of the Proposed Class Members "in one stroke." *See* Doe v. Jo Ellen Smith Medical Foundation, 2012-0966, p.8 (La. App. 4th Cir. 4/24/13), 115 So.3d 655, 661 (*quoting* Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)).

In *Doe v. Joe Ellen Smith,* for example, the Louisiana Fourth Circuit both certified, and then refused to de-certify, the class:

> ... the common question of fact remains whether JESPH exposed to public view and scrutiny privileged documents containing patient names or other identifying information without the prior written consent of each patient. Additionally, as this Court observed when it previously affirmed class certification, 'the single most important issue to be determined is the duty of appellants and their possible liability for this incident.' These issues of law and fact are not only common to all class members, but also predominate over questions raised by individual class members.

Doe v. Jo Ellen Smith, supra, at p.9, 115 So.3d at 661;[6] *see also, e.g.,* In re Facebook Internet Tracking Litigation, No.12-02314, 2022 WL 16902426 at \*4 (N.D.Cal. Nov. 10, 2022) (certifying class of Facebook customers against company for knowingly intercepting and tracking users' internet activity).[7]

In this case, the common question of fact is whether LCMC used the Meta Pixel on its websites to capture communications from its patients and re-direct those communications, and the protected health information contained therein, to Facebook and/or other third parties. This is the single most important issue to be determined, along with the common and unform legal duties and

---

[6] *See also, e.g.,* Oubre v. Louisiana Citizens, 07-66 (La. App. 5th Cir. 5/29/07), 961 So.2d 504 (commonality established where all of the plaintiffs allege the same wrongful conduct, and seek the same type of damages, *i.e.* statutory penalties), *writ denied,* 964 So.2d 363 (La. 2007), *and, later proceeding,* 2011-0097 (La. 12/16/2011), 79 So.3d 987;  Fransen v. City of New Orleans, 2016-0844 (La. App. 4th Cir. 3/28/18), 317 So.3d 372, 385-386 (finding commonality with respect to the defendants' status as "debt collectors" as well as the plaintiffs' claims for the return of unconstitutional penalties and fees); Duhon v. Harbor Homeowners' Association, 2015-0852 (La. App. 4th Cir. 6/30/16), 197 So.3d 322, 328 (commonality established with respect to the defendant's failure to purchase sufficient insurance coverage and failure to provide maintenance and repairs in a timely and appropriate manner); Smith v. City of New Orleans, 2013-0802 (La. App. 4th Cir. 12/23/13), 131 So.3d 511, 521 (commonality established where, factually, all class members share being affected by the City's issuance of citations, and, legally, the predominant question is whether such parking citations were illegally issued prior to the ordinance becoming effective).

[7] The Louisiana Code of Civil Procedure Articles on class actions were specifically amended in 1997 to bring them more in line with the then-current (and, in pertinent part, now-current) Federal Rule. *See, e.g.,* Billieson v. City of New Orleans, 98–1232, p.5 (La.App. 4th Cir. 3/3/99), 729 So.2d 146, 151; *citing,* Lambert, Certification of Class Actions in Louisiana, 58 LA. L.REV. 1085, 1087-1088 (1998). But even before this change in the law, Louisiana Courts looked to Federal Court interpretations of Federal Rule of Civil Procedure 23 in order to determine whether a class action should be certified in the State of Louisiana. *See, e.g.,* Banks v. New York Life, 98–0551, pp.7-8 (La.7/2/99), 737 So.2d 1275, 1280 (on rehearing); Ford v. Murphy Oil, 96–2913 (La. 9/9/97), 703 So.2d 542; McCastle v. Rollins Environmental Services, 456 So.2d 612, 617 (La. 1984); Stevens v. Board of Trustees, 309 So.2d 144, 150-151 (La. 1975).

Page **4** of **9**

E-Filed

FILED

2023 JAN 03  P 03:26

CIVIL

consequences that flow therefrom. Those issues of law and fact are not only common to all DISTRICT COURT
Proposed Class Members, but also predominate over any individual questions (if any) that might
be raised.

## Plaintiff's Claims are Typical of the Class Claims

The plaintiff's claims are typical of the claims of other Proposed Class Members, as they
all arise out of the same practice and course of conduct, and are based on the same legal theory.
*See* Baker, supra, at p.21, 167 So.3d at 543; *citing,* Lambert, Certification of Class Actions in
Louisiana, 58 LA. L.REV. 1085, 1094 (1998); Desselle v. Acadian Ambulance Serv., 11-742, p.9
(La. App. 3rd Cir. 2/1/12), 83 So.3d 1243, 1251.

## Plaintiff and the Undersigned Will Adequately Represent the Class

Plaintiff is a member of the Proposed Class, who has suffered a concrete injury, and has
no interests antagonistic to the interests of the other members of the Proposed Class. Plaintiff is
committed to vigorous representation of the Proposed Class, and has hired competent counsel who
are also committed to the prosecution of this case on behalf of the class as a whole and are
experienced in this type of complex litigation. Consequently, the requirements for adequacy of
representation are satisfied. *See, e.g.,* Baker, supra, at p.22, 167 So.3d at 544; Desselle, supra, at
p.10, 83 So.3d at 1251.

## The Class Is Defined in Terms of Objectively Ascertainable Criteria

Plaintiff seeks to certify a class preliminarily defined as:

> All citizens of the state of Louisiana who, from June 15, 2012 thru [the Date
> of Certification] are, or were, patients of LCMC Health or any of its
> affiliates, and who exchanged communications on one or more of
> Defendant's websites.[8]

This Proposed Class is defined objectively in terms of ascertainable criteria, such that the
Court may determine the constituency of the class for purposes of the conclusiveness of any
judgment rendered in the case. LA. CODE CIV. PROC. ART. 591(A)(5). Indeed, it is believed and
alleged that Defendant (and/or one or more third parties, such as and including Facebook) maintain
records from which each Proposed Class Member can be identified and ascertained. *See, e.g.,*
Baker, supra, at p.23, 167 So.3d at 544 (defendant's own billing documents will serve in defining

---

[8] Excluded from the Proposed Class are (1) any Judge or Magistrate or Special Master presiding over this
action and members of their families and staffs; (2) the Defendant, Defendant's subsidiaries, affiliates, parents,
successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest, as well as their
current or former officers, directors, and/or employees; and (3) Plaintiff's counsel and Defendant's counsel.

E-Filed

the class, as these documents can be utilized to identify those insureds defendant has pursued under the complained-of collection policy).

## Certification for Injunctive and Equitable Relief under Article 591(B)(2)

A class can be certified for injunctive, declaratory, or other equitable relief under Louisiana Code of Civil Procedure Article 591(B)(2) where the defendant has "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." In this case, the defendant has employed the same digital tool with respect to all of the Proposed Class Members who have accessed one or more of the defendant's subject websites, and injunctive relief is appropriate to prevent continued violations of the Louisiana Wire-Tapping Act and other State Law. *See, e.g.,* In re Facebook Internet Tracking Litigation, supra, 2022 WL 16902426 at *2; Campbell v. Facebook, Inc., 951 F.3d 1106 (9th Cir. 2020) (affirming class settlement to enjoin Facebook from intercepting, cataloguing, and using customers' URLs in violation of the Federal Electronic Communications Privacy Act and the California Invasion of Privacy Act); Gaston v. LexisNexis Risk Solutions, 483 F.Supp.3d 318, 341-343 (W.D.N.C. 2020) (certifying class under Rule 23(b)(2) for injunction to prevent further disclosure of personal information from motor vehicle records in violation of the DPPA) (*citing* Adkins v. Facebook, 424 F.Supp.3d 686, 698 (N.D.Cal. 2019) (certifying a 23(b)(2) class in a data breach action in which plaintiffs sought injunctive relief to require Facebook to implement and maintain certain reasonable security measures, even though Facebook argued it had allegedly fixed the bug that caused the data breach)).

Courts have similarly certified class-wide equitable claims for the restitution of ill-gotten gains. *See, e.g.,* Andrews v. TransUnion Corp., 2004-2158 (La. App. 4th Cir. 8/17/05), 917 So.2d 463, *writ denied,* 926 So.2d 495 (La. 4/17/06) (certifying class for unjust enrichment, seeking disgorgement of profits that TransUnion unlawfully earned from its sale of information in plaintiffs' private consumer credit files to target marketers in violation of Louisiana consumer protection statutes).

## Certification of Claims for Statutory Penalties under Rule 23(b)(3)

This case, as noted, is inherently suitable for class treatment. This is not a "sprawling" mass tort class action, where multiple defendants, choice of law issues, or individual issues of assumption of risk, comparative fault, causation, reliance, or damages, might render certification

inappropriate or incomplete. Rather, the defendant breached identical statutory duties owed to each and every Class Member, in an objective and mathematically quantifiable way.

The central, predominant question of fact is whether LCMC used various digital marketing and automatic re-routing tools embedded on its websites to capture communications with its patients and re-direct their protected health information to Facebook and/or other third parties. This is a common question, which can and should be adjudicated on a class-wide basis. Once resolved, the Court can make the common class-wide legal determination of whether and how such conduct violates the Louisiana Wire Tapping statute, and the penalties (and/or restitution) arising therefrom.

The assessment of such penalties (and/or distribution of ill-gotten gains) can be quantified objectively from the defendant's own business records. Such awards will not require the introduction of new and substantial legal or factual issues, nor entail complex individualized determinations, nor require additional hearings to resolve the disparate merits of each individual Class Member's case; rather, they are capable of computation by means of objective standards, and are not dependent in any significant way on the intangible, subjective differences of each Class Member's circumstances.[9]

The common issues predominate over the individual issues (if any), and the class action is the superior method of adjudicating this controversy. *See, e.g.,* Baker, supra (La. 5/5/15), 167 So.3d at 541-542 (certifying class for the enforcement of the Louisiana Balance Billing Act); Oubre v. Louisiana Citizens, 07-66 (La. App. 5th Cir. 5/29/07), 961 So.2d 504 (certifying class for statutory penalties), *and, later proceeding,* 2011-0097 (La. 12/16/2011), 79 So.3d 987 (affirming award to class members of statutory penalties based on defendant's own business records); Doe v. Jo Ellen Smith, supra, 2012-0966 (La. App. 4th Cir. 4/24/13) (maintaining certification against hospital for unauthorized disclosure of confidential patient information); Orrill v. La. Citizens Fair Plan, 2011-1541 (La. App. 4th Cir. 06/13/12), 96 So.3d 647 (affirming certification of claims for statutory penalties under the Louisiana Insurance Code), *writ denied,* 2012-1643 (La. 12/14/12);

---

[9] *See, e.g.,* Baker, supra, at pp.18-19, 167 So.3d at 541-542 ("the record shows there is little proof on liability or causation necessary in this case individual to each plaintiff. Their claims do not require highly individualized inquiries into the cause of the damages. The alleged damages were caused by Minden's acting pursuant to its collection policy and procedure. The eventual question for the factfinder is whether or not Minden's actions violated the Balance Billing Act. Once the factfinder determines Minden's actions pursuant to its collection policy did or did not violate the Balance Billing Act, liability and causation for all class members is decided.... There is no indication the consideration of the billing issue, particular to the plaintiffs, would require individual trials or be unduly burdensome. To the contrary, the evidence shows many claims may be small or nominal in nature, rendering individual actions financially impractical, if not impossible. Accordingly, we find the evidence does reasonably show the class action is the superior method for adjudication").

FILED

2023 JAN 03  P 03:26

CIVIL
DISTRICT COURT

Andrews v. TransUnion, supra, 2004-2158 (La. App. 4th Cir. 8/17/05) (certifying class for unjust enrichment, seeking disgorgement of profits that TransUnion unlawfully earned from its sale of information in plaintiffs' private consumer credit files to target marketers in violation of Louisiana consumer protection statutes); In re Facebook, supra, No.12-02314 (N.D.Cal. Nov. 10, 2022) (certifying class of Facebook customers against company for knowingly intercepting and tracking users' internet activity).

## Conclusion

For the above and foregoing reasons, the Court should certify this case as a class action under Articles 591(B)(2) and 23(B)(3) of the Louisiana Code of Civil Procedure.

This 3rd day of January, 2023.

Respectfully submitted,

/s/ Stephen J. Herman
**Stephen J. Herman**, La. Bar No. 23129
**Joseph E. "Jed" Cain**, La. Bar No. 29785
**HERMAN, HERMAN, & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892
Facsimile: (504) 561-6024
E-Mail: sherman@hhklawfirm.com
E-Mail: jcain@hhklawfirm.com

**Foster C. Johnson** (*pro hac vice forthcoming*)
**David Warden** (*pro hac vice forthcoming*)
**Weining Bai** (*pro hac vice forthcoming*)
**AHMAD, ZAVITSANOS, & MENSING, P.C.**
1221 McKinney Street, Suite 3460
Houston, Texas 77010
Telephone: (713) 655-1101
E-Mail: fjohnson@azalaw.com
E-Mail: dwarden@azalaw.com
E-Mail: ncampbell@azalaw.com

*Counsel for Plaintiff Jane Doe,*
*Individually and on Behalf of*
*All Others Similarly Situated*

E-Filed

FILED

2023 JAN 03  P 03:26
CIVIL
DISTRICT COURT

**Certificate of Service**

I HEREBY CERTIFY that on the 3rd day of January, 2023, the above and foregoing

Memorandum will be electronically filed into the Court Record, and a copy of the Motion and

Memorandum will also be served upon Defendant, thought its Agent for Service of Process, *via*

U.S. Mail, properly addressed and postage pre-paid:

> LCMC Health Holdings, Inc.
> *Through its Designated Agent for Service of Process:*
> ROBERT HINYUB
> 4200 Houma Blvd.
> Metairie, LA 70006

/s/ Stephen J. Herman

E-Filed

**ATTORNEY'S NAME:** Herman, Stephen J 23129
**AND ADDRESS:** 820 O'Keefe Ave , New Orleans, LA 70113-6060

# CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
## STATE OF LOUISIANA

**NO: 2022-10417**            **DIVISION: L**            **SECTION: 06**

DOE, JANE

**Versus**

### LCMC HEALTH HOLDINGS, LLC

## CITATION

TO:            LCMC HEALTH HOLDINGS, INC.

THROUGH:    ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB

4200 HOUMA BLVD, METAIRIE, LA 70006

## YOU HAVE BEEN SUED:

You must either comply with the demand contained in the

AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS

a certified copy of which accompanies this citation, or file an answer or other legal pleading within the delay

provided by Civil Code of Procedure Article 1001. The mentioned article is noted on the back of this page for

your reference. You may make your filing in the office of the Clerk of this Court, Room 402, Civil Courts

Building, 421 Loyola Avenue, New Orleans, LA 70112.

## ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may contact the New Orleans Lawyer Referral Service at https://neworleansbar.community.lawyer/. This Referral Service operates in conjunction with the New Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through Southeast Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-1000.

********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE********

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the Parish of Orleans, State of LA December 6, 2022**

**Clerk's Office, Room 402**
**Civil Courts Building**
**421 Loyola Avenue**
**New Orleans, LA 70112**

**CHELSEY RICHARD NAPOLEON, Clerk of**
**The Civil District Court**
**for the Parish of Orleans**
**State of LA**
**by** _____
**Kasie Jiles, Deputy Clerk**

---

**SHERIFF'S RETURN**
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ served a copy of the within | On this _____ day of _____ served a copy of the within |
| AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS | AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS |
| ON LCMC HEALTH HOLDINGS, INC. | ON LCMC HEALTH HOLDINGS, INC. |
| THROUGH: ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB | THROUGH: ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB |
| Returned the same day _____ No. _____ | by leaving same at the dwelling house, or usual place of abode, in the hands of _____ a person of suitable age and discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM/HER the said LCMC HEALTH HOLDINGS, INC. being absent from the domicile at time of said service. |
| Deputy Sheriff of _____ | |
| Mileage: $ _____ | |
| / ENTERED / | Returned the same day |
| PAPER        RETURN | _____ No. _____ |
| _____/_____/_____ | Deputy Sheriff of _____ |
| SERIAL NO.    DEPUTY    PARISH | |

ID: 11045255                           Page 1 of 2

Civil Code of Procedures
Article 1001

Art. 1001. Delay for answering

A. A defendant shall file his answer within twenty-one days after service of citation upon him, except as otherwise provided by law. If the plaintiff files and serves a discovery request with his petition, the defendant shall file his answer to the petition within thirty days after service of citation and service of discovery request.

B. When an exception is filed prior to answer and is overruled or referred to the merits, or is sustained and an amendment of the petition ordered, the answer shall be filed within fifteen days after the exception is overruled or referred to the merits, or fifteen days after service of the amended petition.

C. The court may grant additional time for answering.

Acts 2021, No. 174, §1, eff. Jan. 1, 2022.

**ATTORNEY'S NAME:**   Herman, Stephen J 23129
**AND ADDRESS:**      820 O'Keefe Ave , New Orleans, LA 70113-6060

# CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
## STATE OF LOUISIANA

| NO: 2022-10417 | DIVISION: L | SECTION: 06 |
|---|---|---|

DOE, JANE

**Versus**

## LCMC HEALTH HOLDINGS, LLC

### CITATION

TO:       LCMC HEALTH HOLDINGS, INC.

THROUGH:   ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB

4200 HOUMA BLVD, METAIRIE, LA 70006

**YOU HAVE BEEN SUED:**

You must either comply with the demand contained in the

AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS

a certified copy of which accompanies this citation, or file an answer or other legal pleading within the delay provided by Civil Code of Procedure Article 1001. The mentioned article is noted on the back of this page for your reference. You may make your filing in the office of the Clerk of this Court, Room 402, Civil Courts Building, 421 Loyola Avenue, New Orleans, LA 70112.

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may contact the New Orleans Lawyer Referral Service at https://neworleansbar.community.lawyer/. This Referral Service operates in conjunction with the New Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through Southeast Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-1000.

********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE********

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the Parish of Orleans, State of LA** December 6, 2022

**Clerk's Office, Room 402**
**Civil Courts Building**
**421 Loyola Avenue**
**New Orleans, LA 70112**

**CHELSEY RICHARD NAPOLEON, Clerk of The Civil District Court for the Parish of Orleans State of LA**
by _____
Kasie Jiles, Deputy Clerk

### SHERIFF'S RETURN
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ served a copy of the within | On this _____ day of _____ _____ served a copy of the within |
| AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS ON LCMC HEALTH HOLDINGS, INC. | AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS ON LCMC HEALTH HOLDINGS, INC. |
| THROUGH: ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB | THROUGH: ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB |
| Returned the same day | by leaving same at the dwelling house, or usual place of abode, in the hands of _____ a person of suitable age and |
| _____ No. _____ | discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM/HER the said LCMC HEALTH HOLDINGS, INC. being absent from the domicile at time of said service. |
| Deputy Sheriff of _____ | |
| Mileage: $ _____ | Returned the same day |
| _____ / ENTERED / _____ | _____ No. _____ |
| PAPER          RETURN | Deputy Sheriff of _____ |
| _____ / _____ / _____ | |
| SERIAL NO.    DEPUTY    PARISH | |

Civil Code of Procedures
Article 1001

Art. 1001. Delay for answering

      A. A defendant shall file his answer within twenty-one days after service of citation upon him, except as otherwise provided by law. If the plaintiff files and serves a discovery request with his petition, the defendant shall file his answer to the petition within thirty days after service of citation and service of discovery request.

      B. When an exception is filed prior to answer and is overruled or referred to the merits, or is sustained and an amendment of the petition ordered, the answer shall be filed within fifteen days after the exception is overruled or referred to the merits, or fifteen days after service of the amended petition.

      C. The court may grant additional time for answering.

      Acts 2021, No. 174, §1, eff. Jan. 1, 2022.

**ATTORNEY'S NAME:** Herman, Stephen J 23129
**AND ADDRESS:** 820 O'Keefe Ave , New Orleans, LA 70113-6060

# CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
## STATE OF LOUISIANA

**NO: 2022-10417**                    **DIVISION: L**                    **SECTION: 06**

DOE, JANE

**Versus**

### LCMC HEALTH HOLDINGS, LLC

#### CITATION

TO:          LCMC HEALTH HOLDINGS, INC.

THROUGH:     ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB
             4200 HOUMA BLVD, METAIRIE, LA 70006

## YOU HAVE BEEN SUED:

You must either comply with the demand contained in the

AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR
PRODUCTION OF DOCUMENTS

a certified copy of which accompanies this citation, or file an answer or other legal pleading within the delay

provided by Civil Code of Procedure Article 1001. The mentioned article is noted on the back of this page for

your reference. You may make your filing in the office of the Clerk of this Court, Room 402, Civil Courts

Building, 421 Loyola Avenue, New Orleans, LA 70112.

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may contact the New
Orleans Lawyer Referral Service at https://neworleansbar.community.lawyer/. This Referral Service
operates in conjunction with the New Orleans Bar Association. If you qualify, you may be entitled to
free legal assistance through Southeast Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-
1000.

********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE********

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the
Parish of Orleans, State of LA December 5, 2022**

**Clerk's Office, Room 402**                              **CHELSEY RICHARD NAPOLEON, Clerk of**
**Civil Courts Building**                                 **The Civil District Court**
**421 Loyola Avenue**                                     **for the Parish of Orleans**
**New Orleans, LA 70112**                                 **State of LA**
                                                          **by** _____
                                                          **Kasie Jiles, Deputy Clerk**

---

**SHERIFF'S RETURN**
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ served a copy of the within | On this _____ day of _____ served a copy of the within |
| AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS | AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS |
| ON LCMC HEALTH HOLDINGS, INC. | ON LCMC HEALTH HOLDINGS, INC. |
| THROUGH: ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB | THROUGH: ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB |
| Returned the same day _____ No. _____ | by leaving same at the dwelling house, or usual place of abode, in the hands of _____ a person of suitable age and discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM/HER the said LCMC HEALTH HOLDINGS, INC. being absent from the domicile at time of said service. |
| Deputy Sheriff of _____ | |
| Mileage: $ _____ | |
| _____ / ENTERED / _____ | Returned the same day |
| PAPER          RETURN | _____ No. _____ |
| _____/_____/_____ | Deputy Sheriff of _____ |
| SERIAL NO.     DEPUTY     PARISH | |

Civil Code of Procedures
Article 1001

Art. 1001. Delay for answering

    A. A defendant shall file his answer within twenty-one days after service of citation upon him, except as otherwise provided by law. If the plaintiff files and serves a discovery request with his petition, the defendant shall file his answer to the petition within thirty days after service of citation and service of discovery request.

    B. When an exception is filed prior to answer and is overruled or referred to the merits, or is sustained and an amendment of the petition ordered, the answer shall be filed within fifteen days after the exception is overruled or referred to the merits, or fifteen days after service of the amended petition.

    C. The court may grant additional time for answering.

    Acts 2021, No. 174, §1, eff. Jan. 1, 2022.

ATTORNEY'S NAME:   Herman, Stephen J 23129
AND ADDRESS:          820 O'Keefe Ave , New Orleans, LA 70113-6060

# CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
## STATE OF LOUISIANA

| NO: 2022-10417 | DIVISION: L | SECTION: 06 |
|---|---|---|

### DOE, JANE

### Versus

### LCMC HEALTH HOLDINGS, LLC

### CITATION

TO:          LCMC HEALTH HOLDINGS, INC.

THROUGH:   ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB

               4200 HOUMA BLVD, METAIRIE, LA 70006

**YOU HAVE BEEN SUED:**

You must either comply with the demand contained in the

AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR
PRODUCTION OF DOCUMENTS

a certified copy of which accompanies this citation, or file an answer or other legal pleading within the delay

provided by Civil Code of Procedure Article 1001. The mentioned article is noted on the back of this page for

your reference. You may make your filing in the office of the Clerk of this Court, Room 402, Civil Courts

Building, 421 Loyola Avenue, New Orleans, LA 70112.

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may contact the New
Orleans Lawyer Referral Service at https://neworleansbar.community.lawyer/. This Referral Service
operates in conjunction with the New Orleans Bar Association. If you qualify, you may be entitled to
free legal assistance through Southeast Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-
1000.

********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE********

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the
Parish of Orleans, State of LA December 5, 2022**

| | |
|---|---|
| **Clerk's Office, Room 402**<br>**Civil Courts Building**<br>**421 Loyola Avenue**<br>**New Orleans, LA 70112** | **CHELSEY RICHARD NAPOLEON, Clerk of**<br>**The Civil District Court**<br>**for the Parish of Orleans**<br>**State of LA**<br>**by** _Kasie Jiles_<br>**Kasie Jiles, Deputy Clerk** |

### SHERIFF'S RETURN
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ served a copy of the within | On this _____ day of _____ _____ served a copy of the within |
| **AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS** | **AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS** |
| ON LCMC HEALTH HOLDINGS, INC. | ON LCMC HEALTH HOLDINGS, INC. |
| THROUGH: ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB | THROUGH: ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB |
| Returned the same day | by leaving same at the dwelling house, or usual place of abode, in the hands of _____ a person of suitable age and discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM/HER the said **LCMC HEALTH HOLDINGS, INC.** being absent from the domicile at time of said service. |
| _____ No. _____ | |
| Deputy Sheriff of _____ | Returned the same day |
| Mileage: $ _____ | _____ No. _____ |
| _____/ ENTERED / _____ | Deputy Sheriff of _____ |
| PAPER        RETURN | |
| _____/ _____/ _____ | |
| SERIAL NO.    DEPUTY    PARISH | |

Civil Code of Procedures
Article 1001

Art. 1001. Delay for answering

      A. A defendant shall file his answer within twenty-one days after service of citation upon him, except as otherwise provided by law. If the plaintiff files and serves a discovery request with his petition, the defendant shall file his answer to the petition within thirty days after service of citation and service of discovery request.

      B. When an exception is filed prior to answer and is overruled or referred to the merits, or is sustained and an amendment of the petition ordered, the answer shall be filed within fifteen days after the exception is overruled or referred to the merits, or fifteen days after service of the amended petition.

      C. The court may grant additional time for answering.

      Acts 2021, No. 174, §1, eff. Jan. 1, 2022.

ATTORNEY'S NAME:   Herman, Stephen J 23129
AND ADDRESS:           820 O'Keefe Ave , New Orleans, LA 70113-6060

# CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
## STATE OF LOUISIANA

| NO: 2022-10417 | DIVISION: L | SECTION: 06 |
|---|---|---|

**DOE, JANE**

**Versus**

**LCMC HEALTH HOLDINGS, LLC**

**CITATION**

TO:            LCMC HEALTH HOLDINGS, INC.

THROUGH:   ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB

4200 HOUMA BLVD, METAIRIE, LA 70006

Orleans Civil Sheriff
Amt. paid for service $39.00
Jefferson Parish Sheriff's Office

## YOU HAVE BEEN SUED:

You must either comply with the demand contained in the

AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS

a certified copy of which accompanies this citation, or file an answer or other legal pleading within the delay provided by Civil Code of Procedure Article 1001. The mentioned article is noted on the back of this page for your reference. You may make your filing in the office of the Clerk of this Court, Room 402, Civil Courts Building, 421 Loyola Avenue, New Orleans, LA 70112.

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may contact the New Orleans Lawyer Referral Service at https://neworleansbar.community.lawyer/. This Referral Service operates in conjunction with the New Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through Southeast Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-1000.

**********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE*********

IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the Parish of Orleans, State of LA December 6, 2022

**Clerk's Office, Room 402**
**Civil Courts Building**
**421 Loyola Avenue**
**New Orleans, LA 70112**

**CHELSEY RICHARD NAPOLEON, Clerk of**
**The Civil District Court**
**for the Parish of Orleans**
**State of LA**
**by** _Kasie Jiles_
Kasie Jiles, Deputy Clerk

---

### SHERIFF'S RETURN
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ served a copy of the within | On this _____ day of _____ served a copy of the within |
| AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS | AMENDED AND RESTATED PETITION, PETITION, REQUEST FOR ADMISSION AND REQUESTS FOR PRODUCTION OF DOCUMENTS |
| ON  LCMC HEALTH HOLDINGS, INC. | ON  LCMC HEALTH HOLDINGS, INC. |
| THROUGH:  ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB | THROUGH:  ITS DESIGNATED AGENT FOR SERVICE OF PROCESS: ROBERT HINYUB |
| Returned the same day | by leaving same at the dwelling house, or usual place of abode, in the hands of |
| _____ No. _____ | _____ a person of suitable age and discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM/HER the said LCMC HEALTH HOLDINGS, INC. being absent from the domicile at time of said service. |
| Deputy Sheriff of _____ | |
| Mileage: $ _____ | |
| _____ / ENTERED / _____ | Returned the same day |
| PAPER              RETURN | _____ No. _____ |
| _____ / _____ / _____ | Deputy Sheriff of _____ |
| SERIAL NO.       DEPUTY       PARISH | |

FILED
2022 DEC 02  P 03:14
CIVIL
DISTRICT COURT

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO. 2022-10417                                                                     DIVISION: "L"

**PEBBLES MARTIN,**
**individually and on behalf of others similarly situated,**

v.

**LCMC HEALTH HOLDINGS, INC.**

FILED _____               DEPUTY CLERK _____

## AMENDED AND RESTATED PETITION

CLASS ACTION

Plaintiff, Pebbles Martin, individually and on behalf of all other Louisiana citizens similarly situated, brings this suit against Defendant, LCMC Health Holdings, Inc., and respectfully represents as follows:

## INTRODUCTION

1.

This case arises from Defendant's systematic violation of the medical privacy rights of its customers, exposing highly sensitive personal information to third parties without their knowledge or consent.

2.

As Defendant's Notice of Privacy Practices explains: "We will not sell or otherwise provide the information we collect to outside third parties for the purposes of … marketing." Contrary to these assurances, Defendant does not follow this policy, nor the law prohibiting such disclosures.

3.

At all relevant times, Defendant disclosed information about its customers – including their status as patients (and/or potential patients), their physicians, their medical treatments, the hospitals they visited, and their personal identities – to Facebook (and/or other third parties) without their knowledge, authorization, or consent.

4.

Defendant discloses this protected health information through the deployment of various digital marketing and automatic re-routing tools embedded on its websites that purposefully and intentionally re-direct customers (and/or would-be customers') personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these re-routing tools causes its patients' personally-identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically re-directed to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of the State of Louisiana, and both the express and implied promises of Defendant.

5.

Defendant's conduct in disclosing such protected health information to Facebook and/or other third parties violates Louisiana law, including La. R.S. 15:1303 (Interception and Disclosure of Wire, Electronic, or Oral Communications), La. R.S. 51:3074 (Protection of Personal Information; Disclosure upon Breach in the Security of Personal Information; and Notification Requirements), 48 La. Admin. Code Pt. 1, §9319 (Patient Rights and Privacy), and La. Admin. Code Pt. 1, §505 (Confidentiality and Disclosure), as well as Louisiana Civil Code Articles 2315, 2316 and/or 2324(A).

6.

On behalf of herself and all similarly situated citizens of Louisiana, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of her personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other relief the Court deems appropriate.

## PARTIES TO THE ACTION

7.

Defendant LCMC Health Holdings, Inc. is a Louisiana corporation with its principal place of business located in the Parish of Orleans, at 1100 Poydras Street, 25th Floor, New Orleans, LA 70163. Defendant is the parent company for multiple healthcare facilities in Louisiana, including East Jefferson General Hospital, Children's Hospital New Orleans, New Orleans East Hospital, Touro Infirmary, University Medical Center New Orleans, West Jefferson

FILED

2022 DEC 02  P 03:14

CIVIL
DISTRICT COURT

Medical Center, and a network of urgent care centers across the greater New Orleans area (collectively "LCMC Health").[1]

8.

Plaintiff, Pebbles Martin, is an individual domiciled and residing in the Parish of Orleans, State of Louisiana. Plaintiff has been treated by University Medical Center, a LCMC Health facility,[2] as well as LCMH Health-employed and/or otherwise associated physicians.

**JURISDICTION AND VENUE**

9.

This Court has personal jurisdiction over Defendant because it regularly conducts business within the State of Louisiana.  Indeed, Defendant's principal place of business is located within the State of Louisiana.

10.

Venue is appropriate in this Court because Defendant's principal place of business is located within the Parish of Orleans and the acts or conduct giving rise to the cause of action asserted herein took place in the Parish of Orleans.

**FACTUAL BACKGROUND**

**A.    Defendant routinely discloses the protected health information of its customers to third parties including Facebook.**

11.

Plaintiff is a customer of Defendant who has received treatment at University Medical Center.[3]

12.

Under Louisiana Law, all patients have "the right to have his/her medical records, including all computerized medical information, kept confidential." 48 La. Admin. Code Pt. 1, §9319.

13.

Medical patients in Louisiana such as Plaintiff have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will

---

[1] *See, e.g.,* https://www.lcmchealth.org/our-locations/
[2] *See, e.g.,* https://www.lcmchealth.org/university-medical-center-new-orleans/
[3] *See, e.g.,* https://www.lcmchealth.org/university-medical-center-new-orleans/

FILED

2022 DEC 02  P 03:14

CIVIL
DISTRICT COURT

not be disclosed to third parties by Defendant without their express written consent, and authorization.

14.

As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

15.

Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

16.

Defendant operates websites for patients, including:

- https://www.lcmchealth.org;

- https://www.chnola.org/;

- https://www.lcmchealth.org/university-medical-center-new-orleans/;

- https://www.lcmchealth.org/touro/;

-  https://www.lcmchealth.org/east-jefferson-general-hospital/; and

- https://www.lcmchealth.org/west-jefferson-medical-center/.

17.

Defendant's websites are designed for interactive communication with potential customers and patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

18.

Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications and protected healthcare information *via* automatic re-routing mechanisms embedded in the websites operated by Defendant without their knowledge, authorization, or consent.

FILED
2022 DEC 02  P 03:14
CIVIL
DISTRICT COURT

**B.    The nature of Defendant's unauthorized disclosure of customers' health care information.**

19.

Defendant's disclosures of personal healthcare information occurs because Defendant intentionally deploys source code on the websites it operates, including www.lcmchealth.org, that causes patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

20.

By design, third parties receive and record the exact contents of an existing or potential customer's communications before the full response from Defendant to patients has been rendered on the screen of the customer's computer device and while the communication between Defendant and the potential patient or patient remains ongoing.

21.

Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users *via* their web browsers.

22.

The basic command that web browsers use to exchange data and user communications is called a GET request.[4]  For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter', the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

23.

The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button.  POST sends the data entered in the form to the server hosting the website that the user is visiting.

24.

In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and

---

[4] *See, e.g.,* https://www.w3schools.com/tags/ref_httpmethods.asp

E-Filed

FILED

2022 DEC 02  P 03:14

CIVIL
DISTRICT COURT

command the browser with source code that directs the browser to render the website's responsive communication.

25.

Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties.  Typically, users are provided no notice that these disclosures are being made.  Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

26.

In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon.  These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

27.

Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly.  A tag manager further obscures the third parties to whom user data is transmitted.

28.

These tracking pixels can collect dozens of data points about individual website users who interact with a website.  One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

29.

A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications.  This source code operates invisibly in the background when users visit a site employing such code.

**C.      Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

30.

Tracking pixels are lines of source code embedded in websites such as Defendant's.  Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors.  While most users believe that the internet provides them with anonymity when, for example,

Page **6 of 43**

FILED
2022 DEC 02  P 03:14
CIVIL
DISTRICT COURT

they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

31.

For example, an IP address is a number that identifies a computer connected to the internet.  IP addresses are used to identify and route communications on the internet.  IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content.  IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices – one that has limited privacy controls.[5]

32.

Because of their uniquely identifying character, IP address are considered protected personally identifiable information.  Tracking pixels can (and typically do) collect website visitors' IP addresses.

33.

Likewise, internet cookies also provide personally identifiable information.  Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server.  Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

34.

Cookies are designed to operate as a means of identification for internet users.  Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history.  To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

35.

Cookies are also considered personal identifiers, and tracking pixels can collect cookies from website visitors.

---

[5] *See, e.g.,* https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

E-Filed

FILED

2022 DEC 02  P 03:14

CIVIL

DISTRICT COURT

36.

A third type of personally identifying information is what data companies refer to as a "browser-fingerprint". A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

37.

These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[6] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[7] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[8]

38.

In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[9]

39.

Browser-fingerprints are also considered protected personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

40.

A fourth kind of personally identifying information is the unique user identifier (such as Facebook's "Facebook ID") that permits companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is a number string that is connected to a user's Facebook profile.[10] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[11]

---

[6] *See, e.g.,* https://www.blog.google/products/chrome/building-a-more-private-web/

[7] *See, e.g.,* https://pixelprivacy.com/resources/browser-fingerprinting/

[8] *See, e.g.,* https://www.blog.google/products/chrome/building-a-more-private-web/

[9] *See, e.g.,* https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

[10] *See, e.g.,* https://www.facebook.com/help/211813265517027

[11]*See, e.g.,* https://smallseotools.com/find-facebook-id/

FILED

2022 DEC 02   P 03:14

CIVIL

DISTRICT COURT

41.

Unique personal identifiers are likewise capable of collection through pixel trackers.

**D.   Facebook.**

42.

Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

43.

Facebook describes itself as a "real identity" platform.[12]   This means that users are permitted only one account and must share "the name they go by in everyday life."[13]   To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[14]

44.

In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[15]   Facebook has since evolved into one of the largest advertising companies in the world.[16]   Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[17]   This allows Facebook to make inferences about users based on their interests, behavior, and connections.[18]

45.

Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network.   Facebook has more than 2.9 billion users.[19]

46.

Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications.   These profiles are associated with personal

---

[12] *See, e.g.,* https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.

[13] *See, e.g.,* https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

[14] *See, e.g.,* https://www.facebook.com/help/406644739431633

[15] *See, e.g.,* https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/

[16] *See, e.g.,* https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

[17] *See, e.g.,* https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[18] *See, e.g.,* https://www.facebook.com/business/ads/ad-targeting

[19] *See, e.g.,* https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

E-Filed

FILED
2022 DEC 02  P 03:14
CIVIL
DISTRICT COURT

identifiers, including IP addresses, cookies, and other device identifiers.  Facebook also tracks non-users across the web through its internet marketing products and source code.

47.

Facebook offers several advertising options based on the type of audience that an advertiser wants to target.   Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting."  Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (*e.g.,* age, gender, education, job title, etc.), interests, (*e.g.,* preferred food, movies), connections (*e.g.,* particular events or Facebook pages), and behaviors (*e.g.,* purchases, device usage, and pages visited).  This audience can be created by Facebook, the advertiser, or both working in conjunction.

48.

Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level.  For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[20]  Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E.   Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

49.

To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

---

[20] *See, e.g.,* https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

50.

One of Facebook's most powerful tools is called the "Meta Pixel."

51.

The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[21] Once activated, the Meta Pixel "tracks the people and type of actions they take."[22]  Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[23]

52.

For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased.  Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user.   Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences.

53.

Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

54.

Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[24]  According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[25]

55.

Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[26]

---

[21] *See, e.g.*, https://developers.facebook.com/docs/meta-pixel/
[22] *See, e.g.*, https://www.facebook.com/business/goals/retargeting
[23] *See, e.g.*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[24] *See, e.g.*, https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[25] *See, e.g.*, https://www.oviond.com/understanding-the-facebook-pixel
[26] *See, e.g.*, https://developers.facebook.com/docs/meta-pixel/get-started

FILED

2022 DEC 02  P 03:14

CIVIL

DISTRICT COURT

56.

Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[27]

57.

Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[28] Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[29]

58.

For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.  The information is sent in data packets, which include personally identifying data such as a user's IP address.

59.

For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[30]  HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[31]  Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[32]

60.

Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account.  Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's

---

[27] *See, e.g.,* https://developers.facebook.com/docs/meta-pixel/get-started

[28] *See, e.g.,* https://developers.facebook.com/docs/meta-pixel/

[29] *See, e.g.,* https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients

[30] *See, e.g.,* https://developers.facebook.com/docs/meta-pixel/

[31] *See, e.g.,* https://developers.facebook.com/docs/meta-pixel/

[32] *See, e.g.,* https://developers.facebook.com/docs/meta-pixel/

FILED

2022 DEC 02  P 03:14

CIVIL

DISTRICT COURT

corresponding Facebook profile.  Facebook stores this information on its servers, and, in some instances, maintains this information for years.[33]

61.

Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

62.

If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account.  For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

63.

Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[34]   The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[35]

64.

Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching."  There are two forms of Advanced Matching: manual matching and automatic matching.[36]  Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data.  Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

65.

While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent Facebook

---

[33] *See, e.g.,* https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

[34] *See, e.g.,* https://clearcode.cc/blog/facebook-first-party-cookie-adtech/

[35] *See, e.g.,* https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

[36] *See, e.g.,* https://www.facebook.com/business/help/611774685654668?id=1205376682832142

FILED
2022 DEC 02   P 03:14
CIVIL
DISTRICT COURT

from using the data.[37]  In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[38]

66.

Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites.   When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets.   The IP address enables Facebook to keep track of the website page visits associated with that address.

67.

Facebook also places cookies on visitors' computers.  It then uses these cookies to store information about each user.  For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID.  The c_user cookie value is the Facebook equivalent of a user identification number.  Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

68.

The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie.   One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#."  For example, the c_user cookie for Mark Zuckerberg is 4.  Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

69.

Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser.  Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers.  Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[39]  These cookies allow Facebook to easily link the browsing activity of its users to their real-world

---

[37] *See, e.g.*, https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[38] *See, e.g.*, https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

[39] *See, e.g.*, https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

FILED

2022 DEC 02  P 03:14

CIVIL
DISTRICT COURT

identities, and such highly sensitive data as medical information, religion, and political preferences.[40]

70.

Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.southcoast.org, and target users with advertising based on their web activity.

**F.     Defendant has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of customers' protected health information to Facebook.**

71.

A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

72.

Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[41] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

---

[40] *See, e.g.,* https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

[41] *See, e.g.,* https://www.facebook.com/business/help/742478679120153?id=1205376682832142

FILED

2022 DEC 02   P 03:14

CIVIL

DISTRICT COURT

73.

Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel

page" in Events Manager, as well as tools and analytics to reach these individuals through future

Facebook ads.[42]  For example, websites can use this data to create "custom audiences" to target

the specific Facebook user, as well as other Facebook users who match "custom audience's"

criteria.[43]  Businesses that use Meta Pixel can also search through Meta Pixel data to find specific

types of users to target, such as men over a certain age.

74.

Meta Pixel is wildly popular and embedded on millions of websites, including many

websites that are used to store and convey sensitive medical information.  Recently, investigative

journalists have determined that Meta Pixel is embedded on the websites of many of the top

hospitals in the United States and on the password-protected patient portals of many healthcare

systems.[44]  This results in sensitive medical information being collected and then sent to

Facebook when a user interacts with these hospital websites.  For example, when a user on many

of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta

Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology")

used to find the doctor to Facebook.  If the hospital's website has a drop-down menu to select a

medical condition in connection with locating a doctor or making an appointment, that condition

is also transmitted to Facebook through Meta Pixel.

75.

Facebook has designed the Meta Pixel such that Facebook receives information about

patient activities on hospital websites as they occur in real time.  Indeed, the moment that a

patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to

register, login, or logout of a patient portal or to create an appointment—Facebook code

embedded on that page redirects the content of the patient's communications to Facebook while

the exchange of information between the patient and hospital is still occurring.

---

[42] *See, e.g.,* https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[43] *See, e.g.,* https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

[44] *See, e.g.,* https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

FILED

2022 DEC 02    P 03:14

CIVIL

DISTRICT COURT

76.

Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is transmitted to Facebook *via* the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

77.

This data, which can include health conditions (*e.g.,* addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

78.

For example, a patient searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's condition, the patient's hometown, the patient's language preference, and other information that the patient provides.

79.

All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

FILED

2022 DEC 02  P 03:14

CIVIL

DISTRICT COURT



80.

Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors to assist with them conditions such as substance abuse and addiction.



## Site search

**Search by keyword**

Substance Abuse

🔍

**Clear filters**

### General content

**View more results**

**Care Management Program**
/for-providers/lcmc-healthcare-partners/care-
management-program/

Helping you Help your Patients As part of the LCMC
Healthcare Partners (LHP) family, our networked
providers have the opportunity to refer their

**View page**

**Behavioral Health**
/our-services/behavioral-health/

When it's Something Other Than Just the Blues
People around the country know New Orleans as a
place to celebrate and "laissez les bon temps
rouler "

**View page**

81.

Likewise, a patient who desires an appointment with a specific doctor is asked to fill out an extensive online questionnaire, which includes information such as the doctor's name, the reason for the visit, to fill out also requests the patient's name, date of birth, address, and contact information.  All this information is acquired by Defendant and forwarded to Facebook via the Meta Pixel contemporaneously with its transmission by patients.

## Request an Appointment

**Already an existing patient?** Log in to the patient portal **to schedule an appointment.**
**Problem Scheduling?** Click here

Patient Information

\* Indicates a required field.

\*
First Name

\*
Address

Middle Name

\*
Last Name

\*
City

\*Legal Sex

\*
State

Female    Male

Unknown    Other

\*
ZIP Code

\*
Home Phone

\*
Date of Birth

Work Phone

Social Security number (Last 4 Digits)

Mobile Phone

\*
Email

| Back | Next |
|------|------|

FILED

2022 DEC 02  P 03:14

CIVIL

DISTRICT COURT

82.

Defendant also discloses patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, and communications made when patients are researching specific medical conditions such as COVID-19.

83.

By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients Personal Health Information to their private identities and target them with advertising.

84.

Defendant facilitated the disclosure of Plaintiff's Personal Health information, including sensitive medical information, to Facebook (and/or other third parties), without her consent or authorization, when she entered information on the website that Defendant maintains at www.lcmchealth.org. Plaintiff continued to have her privacy violated when Defendant permitted Facebook and other companies to send her targeted advertising related to her medical condition.

85.

For example, Plaintiff visited Defendant's website in 2022 at www.lcmchealth.org and entered data, including sensitive medical information, such as details about her medical condition and doctor.   The information that Plaintiff transmitted included queries about a medical procedure of a sensitive nature.

86.

After entering her medical information on Defendant's website, Plaintiff began receiving ads on her Facebook page related to her medical condition.

87.

As a result of Defendant's compliance and aid in the illegal interception and disclosure of her Personal Health Information, Plaintiff received advertisements that were specifically tailored to her Personal Health Information, including sensitive medical information, that she entered on Defendant's website.   These advertisements were tailored and directed to Plaintiff by Facebook

FILED
2022 DEC 02   P 03:14
CIVIL
DISTRICT COURT

as part of Facebook's advertising business in which Facebook profits from providing third

parties with access to those individuals most likely to be interested in their products or services,

otherwise known as the "target audience."[45]

88.

Defendant knew that by embedding Meta Pixel – a Facebook advertising tool – it was

permitting Facebook to collect, use, and share Plaintiff's and the Class Members' Personal

Health Information, including sensitive medical information and personally identifying data.

**G.    Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

89.

Plaintiff and Class Members had no idea when they interacted with Defendant's websites

that their personal data, including sensitive medical data, was being collected and transmitted to

Facebook.    That is because, among other things, Meta Pixel is seamlessly integrated into

Defendant's websites and is invisible to patients visiting those websites.

90.

For example, when Plaintiff visited Defendant's website in 2022 at www.lcmchealth.org,

there was no indication that Meta Pixel was embedded on that website or that it would collect

and transmit her sensitive medical data to Facebook.

91.

Plaintiff and her fellow Class Members could not consent to Defendant's conduct when

there was no indication that their sensitive medical information would be collected and

transmitted to Facebook in the first place.

92.

While Defendant purports to have "Privacy Practices", those Privacy Practices are

effectively hidden from patients, buried inside a link labeled "Privacy Policy" that is concealed

at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:

---

[45] *See, e.g.,* https://www.facebook.com/business/ads/ad-targeting?content

FILED

2022 DEC 02  P 03:14

CIVIL

DISTRICT COURT



93.

While disclosing that its website contains "cookies", Defendant's "Privacy Policy" falsely promises patients that the "usage of a cookie is in no way linked to any personally identifiable information on our site."[46]  Contrary to that representation, Defendant's website automatically transmits personally identifiable information to Facebook using multiple cookies, including c_user, datra, fr, and xs cookies. Defendant's "Privacy Policy" gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information.  Indeed, Defendant expressly promises in its "Privacy Policy" that "We will not sell or otherwise provide the information we collect to outside third parties for the purpose of direct or indirect mass email marketing."[47]  Defendant further promises that it will only "disclose personal information and/or an IP address" when required by law or in the good faith belief that such disclosures are necessary for the investigation of "purported unlawful activities."[48]

94.

Even if a patient stumbled upon Defendant's carefully hidden "Privacy Policy," nothing in that notice would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

95.

Defendant does not have a legal right to share Plaintiff's and Class Members' Protected Health Information without their written consent because this information is protected from such disclosure by law.[49]  Much less is Defendant permitted to disclose patients' protected health information to advertising and marketing companies like Facebook without express written

---

[46] *See, e.g.*, https://www.lcmchealth.org/privacy-policy/
[47] *See, e.g.*, https://www.lcmchealth.org/privacy-policy/
[48] *See, e.g.*, https://www.lcmchealth.org/privacy-policy/
[49] *See, e.g.*, La. R.S. 51:3074; (*see also, e.g.*, 45 C.F.R. §164.508).

FILED

2022 DEC 02  P 03:14

CIVIL

DISTRICT COURT

authorization from patients.[50] Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

96.

A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website.  Such "Browser-Wrap" statements do not create an enforceable contract against consumers.  Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

97.

Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiffs and Class Members' Personal Health Information to Facebook or aid in the same.

**H.    Defendant's disclosures of Plaintiff and the Class Members' Personal Health Information to Facebook are unnecessary.**

98.

There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook.  Nor are the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website.

99.

For example, it possible for a health care website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments.  It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

100.

Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical

---

[50] *See, e.g.,* 48 La. Admin. Code Pt 1, §9319.

E-Filed

FILED

2022 DEC 02 P 03:14

CIVIL
DISTRICT COURT

information about its patients, as well as the contents of their communications with Defendant to third-parties, including Facebook.

**I.    Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

101.

Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiffs and Class Member's privacy interests.

102.

Patient Personal Health Information is specifically protected by law. *See, e.g.,* La. R.S. 51:3074, *and,* 48 La. Admin. Code Pt 1, §9319. The prohibitions against disclosing personally identifying information include prohibitions against disclosing personally identifying data such patient names, IP addresses, and other unique characteristics or codes. *See, e.g.,* La. Admin. Code Pt 1, §505; (*see also, e.g.,* 45 C.F.R. §164.514). This legal framework applies to health care providers, such as Defendant.

103.

Given the public policy expressed by these laws, Plaintiff and Class Members had a reasonable expectation of privacy in their protected health information.

104.

Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

105.

Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

106.

For example, a recent study by Consumer Reports showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites

FILED

2022 DEC 02  P 03:14

CIVIL
DISTRICT COURT

should be required to provide consumers with a complete list of the data that has been collected about them.[51]

107.

Users act consistently with these preferences.  For example, following a new rollout of the iPhone operating software – which asks users for clear, affirmative consent before allowing companies to track users – 85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[52]

108.

The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable.  Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born.  As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[53]

109.

Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook.  As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

---

[51] *See, e.g.*, https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

[52] *See, e.g.*, https://www.wired.co.uk/article/apple-ios14-facebook

[53] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

E-Filed